**GOOD | GUSTAFSON | AUMAIS LLP**
CHRISTOPHER T. AUMAIS, SBN 249901
CHRISTOPHER B. GOOD, SBN 232722
RYAN GUSTAFSON, SBN 220802
2330 Westwood Boulevard, Suite 103
Los Angeles, California 90064
Telephone: (310) 274-4663
E-mail: cta@ggallp.com
E-mail: cbg@ggallp.com
E-mail: jrg@ggallp.com

**THE KEETON FIRM LLC**
Steffan T. Keeton (*Pro hac vice forthcoming*)
100 S Commons, Ste. 102
Pittsburgh PA 15212
Tel: (888) 412-5291
stkeeton@keetonfirm.com

*Counsel for Plaintiff and the Proposed Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISON

| | |
|---|---|
| John Forrett, individually, and on behalf of those similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>Gourmet Nut, Inc.,<br><br>    Defendant. | CASE NO.  22-cv-02045-BLF<br><br>**CLASS ACTION COMPLAINT**<br><br>**Demand for Jury Trial** |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff John Forrett ("Plaintiff") brings this action, individually and on behalf of all others similarly situated, against Defendant Gourmet Nut, Inc. ("Defendant"). Plaintiff makes the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

– 1 –

**GOOD GUSTAFSON AUMAIS LLP**

**NATURE OF THE ACTION**

1. This case arises out of Defendant's deceptive, misleading, and unlawful practices with respect to its marketing and sale of its Protein Packed Trail Mix (the "Product" or "Products").

2. Defendant manufactures and sells its Products throughout the United States in a variety of physical and e-commerce stores.

3. Defendant's marketing stresses the importance of protein consumption, the health benefits of its Products, and the high-protein nature of its Products.

4. Notably, all Products are labeled as "PROTEIN PACKED" despite neither being high in protein nor a good source of protein.

5. Moreover, in violation of federal and state regulations, Defendant attempts to perpetuate this deception by prominently making protein claims on the Principal Display Panel and the back of the packaging while also omitting the Percent Daily Value for protein in the Nutrition Facts panel on the Products' labels.

6. Consumers are increasingly health conscious and, as a result, many consumers seek foods high in protein. To capitalize on this trend, Defendant prominently labels its Products as providing high amounts of protein per serving, such as "PROTEIN PACKED". Moreover, Defendant includes information describing the health benefits of consuming the protein contained in the Product. For example, Defendant emphasizes the Product's role in muscle tissue formation, leading a healthy diet, and assisting with workouts. Consumers, in turn, reasonably expect that each product will actually provide the amounts of protein claimed on the front and back of the product package in a form the body can use.

7. The Food and Drug Administration ("FDA") prohibits such prominent label claims about the amount of protein unless manufacturers also provide additional information in the nutrition fact panel ("NFP") about how much of the recommended daily value for protein that the product will actually provide. 21 C.F.R. §§ 101.9(c)(7)(i), 101.13(b), (n). That is because the FDA recognizes that (1) when

GOOD GUSTAFSON AUMAIS LLP

manufacturers tout an amount of protein on the front label, that amount is likely to be material to purchasing decisions, even though reasonable consumers may not know the total amount of protein they need to ingest on a daily basis, and (2) not all proteins are the same in their ability to meet human nutritional requirements, so a simple statement about the number of grams does not actually inform consumers about how much usable protein they are receiving. Some proteins are deficient in one or more of the nine amino acids essential to human protein synthesis and/or are not fully digestible within the human gut. When a human body uses up the least prevalent essential amino acid from a food product, protein synthesis shuts down and all of the remaining amino acids from that protein source degrade mostly into waste. Likewise, whatever portion of a protein source is not digestible is similarly unavailable for protein synthesis. A protein's ability to support human nutritional requirements is known as its "quality."

8.      The FDA required method for measuring protein quality is called the "Protein Digestibility Corrected Amino Acid Score"—known by its acronym PDCAAS. It combines a protein source's amino acid profile and its percent digestibility into a discount factor ranging from 0.0 to 1.0 that, when multiplied by the total protein quantity, shows how much protein in a product is actually available to support human nutritional requirements. The regulations term this the "corrected amount of protein per serving." 21 C.F.R. § 101.9(c)(7)(ii). For example, a PDCAAS of .5 means that only half of the protein in that product is actually available to support human protein needs. If the product contained 10 grams total protein per serving, the corrected amount of protein would be only 5 grams per serving. As a result, protein products can vary widely in their ability to support human protein needs—even between two comparator products with the same total protein quantity.

9.      Because consumers are generally unaware about the usability of various proteins, and may even be unaware of the total amount of usable protein they should ingest each day, the FDA prohibits manufacturers from advertising or promoting

GOOD GUSTAFSON AUMAIS LLP

their products with a protein claim unless they have satisfied two requirements. First, the manufacturer must calculate the "corrected amount of protein per serving" based on the quality of the product's protein using the PDCAAS method. Second, the manufacturer must use the PDCAAS computation to provide "a statement of the corrected amount of protein per serving" in the nutrition facts panel ("NFP") "expressed as" a percent daily value ("%DV") and placed immediately adjacent to the statement of protein quantity. 21 C.F.R. § 101.9(c)(7)(i)-(iii). The %DV is the corrected amount of protein per serving divided by the daily reference value for protein of 50 grams. Id. Using the same example of a product containing 10 grams total protein per serving with a PDCAAS of .5, the %DV is 10% (5g/50g). Had all of the protein in the product been useful in human nutrition, the %DV would be 20% (10g/50g). The FDA regulations that govern nutrient content claims are also clear that a manufacturer may not make any claims on the packaging about the amount of protein in the product unless it complies with these two requirements. See 21 C.F.R. § 101.13(b) ("A nutrient content claim[] may not be made on the label…unless the claim is made in accordance with this regulation [i.e., § 101.13]…" and (n) ("[n]utrition labeling in accordance with § 101.8…shall be provided for any food for which a nutrient content claim is made"); accord 58 Fed. Reg. 2302, 23310 (manufacturer can only make a "nutrient content claim…on the label or in labeling of a food, provided that the food bears nutrition labeling that complies with the requirements in proposed § 101.9.").

10.     The primary protein source in Defendant's products are almonds and peanuts. The PDCAAS scores for both fall between approximately .5 and .7, which means Defendant's products will provide nutritionally less than 30-50% of the protein quantity claimed. Nevertheless, Defendant failed to provide in the NFP a statement of the corrected amount of protein per serving calculated according to the PDCAAS methodology and expressed as a %DV. Accordingly, the protein claims on the front and back of the package, such as "PROTEIN PACKED" are unlawful in violation of parallel state and federal laws because Defendant did not comply with the regulatory

requirements for making a protein claim. 21 C.F.R. § 101.9(c)(7)(i), 101.13(b), (n). The failure to include a statement of the corrected amount of protein inside the NFP also rendered the NFP itself unlawful. Id. § 101.9(c)(7)(i).

11.     In addition to being unlawful under 21 CFR §§ 101.9 and 101.13, Defendant's prominent protein claims on the front and back of the package while omitting the statement of the corrected amount of protein per serving expressed as a %DV in the NFP, is also likely to mislead reasonable consumers. Consumers reasonably expect that Defendant's products will actually provide nutritionally the amount of protein claimed on the front of the package and stated in the protein quantity section of the NFP, i.e., that the products contain high quality proteins. But Defendant's products do not do so and instead contain low quality proteins. Had Defendant included a statement of the corrected amount of protein per serving in the NFP, as it was required to do under the law, it would have revealed that the Product contains low quality proteins. That information was material to reasonable consumers.

12.     Plaintiff and other reasonable consumers purchased the Products believing that they were accurately represented. Specifically, Plaintiff and reasonable consumers believed that the Products contained accurate label information and representations. Plaintiff and other reasonable consumers would not have purchased the Products if they had known about the misrepresentations and omissions, or would have purchased them on different terms.

13.     Plaintiff brings this action individually and on behalf of those similarly situated and seeks to represent a California Class. Plaintiff seeks damages, interest thereon, reasonable attorneys' fees and costs, restitution, other equitable relief, and disgorgement of all benefits Defendant has enjoyed from its unlawful and deceptive business practices, as detailed herein. In addition, Plaintiff seeks injunctive relief to stop Defendant's unlawful conduct in the labeling and marketing of the Products.

GOOD GUSTAFSON AUMAIS LLP

GOOD GUSTAFSON AUMAIS LLP

**PARTIES**

14.     Plaintiff is a citizen of California, who purchased the Products during the class period, as described herein. The advertising and labeling on the package of the Products purchased by Plaintiff, including the high-protein representations, is typical of the advertising and labeling of the Products purchased by members of the Class. In June 2020, Plaintiff purchased the Product and paid approximately $5 per bag from a Walmart store located in San Jose, CA. In making his purchase, Plaintiff relied upon Defendant's labeling and advertising claims, namely, the "PROTEIN PACKED" representations made throughout the Product's packaging and the health-emphasis paragraph on the back of the packaging.

15.     In purchasing the Products, Plaintiff was exposed to, read, and relied upon Defendant's labeling claims that were intended to appeal to consumers interested in protein-focused products. To the best of his recollection, Plaintiff read and relied on Defendant's labeling representations including "protein packed," and the Products did not have a percentage of the Daily Recommended Value ("DRV") listed for protein.

16.     These statements and omissions led Plaintiff to believe that consuming the Products would provide an excellent source of protein and assist with leading a healthy lifestyle.

17.     Plaintiff continues to desire to purchase protein products, including those marketed and sold by Defendant, and would like to purchase products that provide excellent sources of quality protein per serving. If the Products that currently make unlawful protein claims are reformulated to ensure they provide, in a usable form, the amounts of quality protein that are represented on the labels, or their labels are changed to provide non-misleading information, Plaintiff would likely purchase those Products again in the future but will not do so until then. Plaintiff regularly visits stores where the Products and other protein products are sold. Because Plaintiff does not know the formula for Defendant's products, which can change over

time, and cannot test whether the Products provide the amount of digestible protein that is represented on the label without first purchasing the Product, Plaintiff will be unable to rely on Defendant's labels when shopping for protein products in the future absent an injunction that prohibits Defendant from mislabeling its Products. Plaintiff would also be forced to retest and/or reanalyze each Product that makes a protein claim but fails to include the %DV at each time of purchase because such Products' ingredient list and labeling would not reveal any changes in the amount of digestible protein, even if such changes took place. In addition, at present Plaintiff cannot rely on the accuracy of Defendant's labels for the entire line of Products, which Plaintiff is also interested in purchasing with labeling that comports with regulations. Should Defendant begin to market and sell a new line of products, Plaintiff could also be at risk for buying another one of Defendant's products in reliance on the same or similar misrepresentation and omissions. And because of Defendant's unlawful and misleading labels on its Products, Plaintiff cannot make informed choices between protein products offered by Defendant and protein products offered by other manufacturers, such as choices based on price and relative nutritional content.

18.     Defendant is a New York corporation with its principal place of business in Perth Amboy, New Jersey. Defendant produces, markets and distributes its consumer food products in retail stores across the United States including stores physically located in the State of California and in this district.

19.     Whenever reference is made in this Complaint to any representation, act, omission, or transaction of a defendant, that allegation shall mean that the defendant did the act, omission, or transaction through its officers, directors, employees, agents, and/or representatives while they were acting within the actual or ostensible scope of their authority.

## **JURISDICTION AND VENUE**

20.     This Court has personal jurisdiction over Defendant. Defendant purposefully avails itself of the California consumer market and distributes the

GOOD GUSTAFSON AUMAIS LLP

Products to many locations within this District and hundreds of retail locations throughout the State of California, where the Products are purchased by hundreds of consumers every day.

21.     This Court has original subject-matter jurisdiction over this proposed class action pursuant to 28 U.S.C. § 1332(d), which, under the provisions of the Class Action Fairness Act ("CAFA"), explicitly provides for the original jurisdiction of the federal courts in any class action in which at least 100 members are in the proposed plaintiff class, any member of the plaintiff class is a citizen of a State different from any defendant, and the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs. Plaintiff alleges that the total claims of individual members of the proposed Class (as defined herein) are well in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs.

22.     Venue is proper in this District under 28 U.S.C. § 1391(a). Plaintiff's purchases of Defendant's Products, substantial acts in furtherance of the alleged improper conduct, including the dissemination of false and misleading information regarding the nature, quality, and/or ingredients of the Products, occurred within this District and the Defendant conducts business in this District.

## DIVISIONAL ASSIGNMENT

23.     Pursuant to Civil Local Rule 3-2(c-d), a substantial part of the events giving rise to the claims arose in Santa Clara County, and this action should be assigned to the San Jose Division.

## FACTUAL ALLEGATIONS

### A.     Defendant Manufactures, Labels, and Advertises the Product

24.     Defendant manufactures, labels, and advertises the Product.

25.     Defendant markets and labels the Product with the representations as described herein. Specifically, the Product contains: (1) protein content claims on the

front and back of the Products' labels, (2) the claim that each product is "PROTEIN PACKED," (3) the paragraph emphasizing the role of protein and the Product's inclusion of protein that can help consumers lead a healthy lifestyle, and (4) the omission of the Percent Daily Value for protein in the Nutrition Facts panel.

26.     The following images display the front label, the back label, and an enlarged Nutrition Facts panel from the back label:



**GOOD GUSTAFSON AUMAIS LLP**



27.     On the front label, as shown above, the Defendant prominently represents that the product is "PROTEIN PACKED."

28.     On the rear label, as shown above, the Defendant prominently represents that the Product is "Protein Packed" and the importance of protein.



29.     In the Nutrition Facts panel, as shown above, the Defendant notably omits the Percent Daily Value for protein.

30.     The protein in the Products is derived from (1) peanuts, (2) almonds, (3) pumpkin seeds, and (4) cashews. All of these protein sources in the Products are incomplete proteins.

**B. Importance of Protein Quality**

31.     Many American consumers are health conscious and seek wholesome, natural foods to keep a healthy diet, so they routinely rely upon nutrition information when selecting and purchasing food items. As noted by FDA Commissioner Margaret Hamburg during an October 2009 media briefing, "[s]tudies show that consumers trust and believe the nutrition facts information and that many consumers use it to help them build a healthy diet." Indeed, the FDA recommends relying on Nutrition Facts Labels as the primary tool to monitor the consumption of protein.[1]

32.     Protein is found throughout the body—in muscle, bone, skin, hair, and virtually every other body part or tissue. The health benefits of protein are well studied and wide ranging. Scientific studies have confirmed that protein can assist in weight loss, reduce blood pressure, reduce cholesterol, and control for risk factors for cardiovascular diseases. The National Academy of Medicine recommends that adults get a minimum of .8 grams of protein for every kilogram of body weight per day, or just over 7 grams for every 20 pounds of body weight.[2]  For a 140-pound person, that means about 50 grams of protein each day. For a 200- pound person, that means about 70 grams of protein each day.

33.     Protein *quantity* by itself does not tell the full story of protein from a human nutritional standpoint. A protein's *quality* is also critical because humans cannot fully digest or utilize some proteins. Proteins are not monolithic. They are

[1] FDA Protein Fact Sheet, https://www.accessdata.fda.gov/scripts/InteractiveNutritionFactsLabel/factsheets/Protein.pdf.
[2] National Academies of Medicine. *Dietary Reference Intakes for Energy, Carbohydrate, Fiber, Fat, Fatty Acids, Cholesterol, Protein, and Amino Acids* (Macronutrients) (2005).

GOOD GUSTAFSON AUMAIS LLP

GOOD GUSTAFSON AUMAIS LLP

1  simply chains of amino acids, and different types of amino acids chained together in

2  different ways will make different types of proteins. Further, the makeup of the

3  protein changes the function of that protein in the body, and certain types of proteins

4  are more easily digested and used by humans than others.

5    34.    All of a human's proteins are formed through the process of protein

6  synthesis within their own bodies. That is, although humans consume dietary

7  proteins, they digest those proteins, break them down into their constituent amino

8  acids, and then use those amino acids as building blocks to synthesize the human

9  proteins necessary for life, tissue repair, and other functions. Of the twenty total

10  amino acids, humans can produce only eleven of them on their own. Humans cannot

11  produce, under any circumstances, nine of the amino acids required for protein

12  synthesis. These nine amino acids are called the "essential amino acids" and they

13  must be supplied through the diet.

14    35.    All nine essential amino acids are necessary for protein synthesis to take

15  place. Lacking even one essential amino acid will prevent protein synthesis from

16  occurring, and the rest of the proteins will degrade into waste. Accordingly, once the

17  body uses up the limiting essential amino acid from a protein source, the remainder

18  of that protein becomes useless to human protein synthesis and has little nutritional

19  value. As the FDA has explicitly recognized, "[b]ecause excess amino acids are not

20  stored in the body, humans need a constant supply of good quality dietary proteins to

21  support growth and development." 58 Fed. Reg. 2079 at 2101. High-quality proteins,

22  therefore, are those that contain all nine essential amino acids because they have a

23  greater effect on protein synthesis and are fully digestible. A dietary protein

24  containing all of the essential amino acids in the correct proportions is typically called

25  a "complete protein."

26    36.    A protein source's digestibility also affects the amount of useable protein

27  a person receives from consuming it. Plant-based proteins like almonds are

28

approximately 50% digestible, meaning 50% of the protein from that source will simply pass through the body without ever being absorbed at all.

37.     As the FDA has stated in official guidance, "Accurate methods for determining protein quality are necessary because different food protein sources are not equivalent in their ability to support growth and body protein maintenance." 56 Fed. Reg. 60366, § B. The Protein Digestibility Corrected Amino Acid Score ("PDCAAS"), is the FDA mandated measure of protein quality, and it accounts for both the amino acid profile and the digestibility of the protein. 21 C.F.R. § 101.9(c)(7)(ii).

38.     The PDCAAS method requires the manufacturer to determine the amount of essential amino acids that the food contains and then combine that with the proteins' digestibility into an overall discount factor (i.e., a "score" from 0.0-1.0) that represents the actual amount of protein the food provides nutritionally when multiplied by raw protein quantity. The regulations term this the "corrected amount of protein per serving." 21 C.F.R. § 101.9(c)(7)(i).

39.     Defendant uses plant-based proteins in its products. Because of the differences in benefits depending on the amino acid composition of a protein, the source of protein is important. Although some plants can be high quality protein sources, most plant-based proteins do not contain all nine essential amino acids and are low quality to humans. The primary sources of the Product's protein is from peanut and almond which have PDCAAS scores of between .5 & .7, meaning approximately 30-50% of the protein from those sources will be useless to humans nutritionally speaking.

40.     Accordingly, Defendant's use of low-quality proteins in the Products means that they actually provide far less protein to humans than the Product labels represent.

**C.  Defendant Violates Identical Federal and State Regulations**

    **a.  Federal and State Regulations are Identical**

CLASS ACTION COMPLAINT

41.     The FDA oversees the regulation and labeling of food pursuant to the Federal Food, Drug and Cosmetic Act ("FDCA").

42.     California's Sherman Food, Drug and Cosmetic Law, Cal. Heath & Saf. Code § 110765 et seq. (the "Sherman Law"), incorporates all food labeling regulations promulgated by the FDA under the FDCA. *See e.g.*, Cal. Heath & Saf. Code § 110100(a) ("All food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be the food labeling regulations of this state."), § 110380 and § 110505.

### b. Regulations Governing the Labeling of Food Products

43.     21 U.S.C. § 343 addresses misbranded food and states that a "food shall be deemed to be misbranded – (a) If (1) its labeling is false or misleading in any particular, or (2) in the case of a food to which section 350 of this title applies, its advertising is false or misleading in a material respect or its labeling is in violation of section 350(b)(2) of this title." *See* 21 U.S.C. § 343(a).

44.     The Product contains an unadjusted 7 grams of protein per serving.

   a. The protein is derived from (1) peanuts, (2) almonds, (3) pumpkin seeds, and (4) cashews.

   b. All of these protein sources in the Products are incomplete proteins.

   c. The protein quality score for peanuts is 0.70, almonds is 0.52, pumpkin seeds is 0.88, and cashews is 0.90.[3]

---

[3] Arya SS, Salve AR, Chauhan S. *Peanuts as functional food: a review*. J FOOD SCI TECHNOL. 2016 Jan;53(1):31-41. doi: 10.1007/s13197-015-2007-9. Epub 2015 Sep 19. PMID: 26787930; PMCID: PMC4711439;
House JD, Hill K, Neufeld J, Franczyk A, Nosworthy MG. *Determination of the protein quality of almonds (Prunus dulcis L.) as assessed by in vitro and in vivo methodologies*. FOOD SCI NUTR. 2019 Jul 29;7(9):2932-2938. doi: 10.1002/fsn3.1146. PMID: 31572586; PMCID: PMC6766546;
Mansour, E.H.; Dworschak, A.L.;
Barna, E.; Gergley, A. *Nutritive value of pumpkin (Cucurbita Pepo Kakai 35) seed products*. JOURNAL OF THE SCIENCE OF FOOD AND AGRICULTURE.  1993.

GOOD GUSTAFSON AUMAIS LLP

d.   Properly adjusted for protein quality, the Products contain less than 10% of the DRV.

45.   The Product makes nutrient content claims concerning protein content.

46.   Reasonable consumers, including Plaintiff, believe that the term "PROTEIN PACKED" means that the products are "high" in protein or constitute an "excellent source" of protein.

47.   This consumer belief is consistent with FDA regulations that provide a benchmark for the ability to claim that a food product is "high," "rich in," or "excellent source of" a particular nutrient – 10 grams or more of complete proteins per serving for protein. *See* 21 C.F.R. § 101.54; 21 C.F.R. § 101.9(c)(7)(iii).

48.   To make a claim that a food is "high" in protein, the foods must meet a certain level of Reference Daily Intake (RDI) or Daily Reference Value (DRV). For example, 21 C.F.R. § 101.54 requires that the "food contains 20 percent or more of the RDI or the DRV per reference amount customarily consumed." For protein, the FDA has established that the RDI or DRV for adults and children over 4 years old is 50 grams of complete protein. 21 C.F.R. § 101.9(c)(7)(iii).

49.   To make a claim that a food is a "good source [of], contains, or provides" protein, the foods must meet a certain level of Reference Daily Intake (RDI) or Daily Reference Value (DRV). For example, 21 C.F.R. § 101.54(c) requires that the "food contains 10 to 19 percent of the RDI or the DRV per reference amount customarily consumed." For protein, the FDA has established that the RDI or DRV for adults and children over 4 years old is 50 grams of complete protein. 21 C.F.R. § 101.9(c)(7)(iii).

50.   Generally, a manufacturer is not required to include the DRV for protein. However, when a product's label makes a nutrient content claim related to protein content, the manufacturer is required to include the DRV.

a.   21 C.F.R. § 101.9(c)(7) and see Guidance for Industry: A Food Labeling Guide, U.S. FOOD & DRUG ADMINISTRATION, https://www.fda.gov/files/food/published/Food-Labeling-Guide-

%28PDF%29.pdf at N22 ("The percent of the DRV is required if a protein claim is made for the product or if the product is represented or purported to be for use by infants or children under 4 years of age.") (last visited March 20, 2022).

51. The Products fail to include the Percent Daily Value for protein.

52. The Products contain less than 10% of the DRV for protein.

53. In other words, the Products contain less than 50% of the protein content required to substantiate high protein claims.

54. By artfully omitting the DRV for protein, the Defendant is able to mislead and deceive consumers that the Products are excellent sources of protein.

55. Despite containing only deficient amounts of protein, consumers are misled by Defendant's marketing, labeling, and advertising to believe that the Products are high in protein.

### c. The Products Are Misbranded Under the Regulations Governing the Labeling of Food Products

56. The marketing of the Product as "PROTEIN PACKED" in prominent locations on the label of the Product, throughout the Class Period, evidences Defendant's awareness that high protein claims are material to consumers.

57. The artful omission of the DRV for protein allows Defendant to further mask the protein deficiencies contained within the Products.

58. As described herein, the Products contain deficient amounts of protein to justify these claims.

59. Thus, the Products' labels are false and misleading, and therefore the Products are misbranded.

60. To be clear, Plaintiff does not allege any claims pursuant to the FDCA and Sherman Law and relies on these regulations only to the extent they provide a predicate basis for liability under state and common law, as set forth herein.

GOOD GUSTAFSON AUMAIS LLP

### d. The Front Label Protein Claims Were Unlawful Due to the Omission of the %DV Inside the Nutrition Facts Panel as was the NFP Itself.

61.    A nutrient content claim is a claim that "expressly or implicitly characterizes the level of a nutrient." 21 C.F.R. § 101.13(b). "Express" nutrient content claims include any statement outside the Nutrition Facts Panel, about the level of a nutrient. 21 C.F.R. 101.13(b)(1). "Implied" nutrient content claims "[d]escribe[] the food or an ingredient therein in a manner that suggests that a nutrient is absent or present in a certain amount." 21 C.F.R. 101.13(b)(2).

62.    The FDA has always considered nutrient content claims to be "a marketing activity," the purpose of which is to advertise a specific product as a "significant source" of the relevant nutrient. 56 Fed. Reg. 60366, 60372, 60375. The FDA has long been suspicious of nutrient content claims and has repeatedly stated that such claims can be misleading, so the rules that govern them are far more restrictive. Indeed, "the general rule is that 'nutrient content claims' are not permitted on food labels" and must instead satisfy all of the requirements of § 101.13 before being authorized to appear at all.

63.    FDA regulations specifically condition the ability to make a nutrient content claim on compliance with the rules governing the NFP. Section 101.9(c)(7)(i), in particular, sets forth special rules for the NFP when manufacturers make a protein claim outside the NFP. It provides that "[a] statement of the corrected amount of protein per serving, as determined in paragraph (c)(7)(ii) of this section, calculated as a percentage of the RDI or DRV for protein, as appropriate, and expressed as a Percent of Daily Value . . . shall be given if a protein claim is made for the product . . ." 21 C.F.R. 101.9(c)(7)(i) (emphasis added). If a manufacturer does not want to perform PDCAAS and provide a statement of the corrected amount of protein per serving in the NFP, then it shall not make any protein claims.

64.    The regulation governing nutrient content claims, section 101.13, also makes this plain. Section 101.13(n) provides that "[n]utrition labeling in accordance

GOOD GUSTAFSON AUMAIS LLP

with § 101.9 . . . shall be provided for any food for which a nutrient content claim is made" and § 101.13(b) states "a nutrient content claim[] may not be made on the label . . . unless the claim is made in accordance with this regulation [i.e., § 101.13] . . . ." In other words, a manufacturer may not make any protein nutrient content claims on the labels of their products unless they have complied with the requirements for protein labeling in the nutrition facts panel pursuant to section 101.9(c)(7). Indeed, the FDA made clear when promulgating § 101.13(n) that it means that a manufacturer can only make "a nutrient content claim . . . on the label or in labeling of a food, provided that the food bears nutrition labeling that complies with the requirements in proposed § 101.9." 58 Fed. Reg. 2302, 23310.

65.   Further, FDA regulations require the %DV for protein to be calculated using PDCAAS, a method that accounts for both protein quantity and protein quality. 21 C.F.R. § 101.9(c)(7)(i)-(iii); FDA Food Labeling Guide, p. 29, Question N.22.[4] The first step is to calculate the "corrected amount of protein per serving" by multiplying protein quantity by the PDCAAS quality value, and then dividing that "corrected amount" by 50 grams (the "recommended daily value" for protein) to come up with the %DV. *Id.*

66.   The Products, currently or during the Class Period, all made protein claims on the front and back of the label but failed to provide a statement of the corrected amount of protein per serving in the NFP calculated according to the PDCAAS method. The protein claims on the front and back are, therefore, unlawful, and were never permitted to be on the labels in the first instance under §§ 101.9(c)(7)(i), 101.13(n), and 101.13(b).

---

[4] Guidance for Industry: A Food Labeling Guide ("FDA Food Labeling Guide") p. 29, Question N22, U.S. Food & Drug Administration, https://www.fda.gov/media/81606/download (last accessed February 19, 2020).

67.    Defendant's failure to include a statement of the corrected amount of protein per serving expressed as a %DV in the NFP also renders the NFP itself unlawful under §§ 101.9(c)(7)(i)-(iii).

68.    Defendant's Products are, therefore, unlawful, misbranded, and violate the Sherman Law, California Health & Safety Code § 110660, *et seq*. Defendant, currently and during the Class Period, made protein content claims on the front and back of its Product packaging even though it uniformly failed to provide a statement of the corrected amount of protein per serving in the NFP calculated according to the PDCAAS method and expressed as a %DV as required by 21 C.F.R. § 101.9(c)(7)(i). Defendant's failure to comply with this requirement render these front label protein claims unlawful *per se* and the product misbranded pursuant to § 101.13(n) and (b), as well as under § 101.9(c)(7)(i) itself. Defendant's NFPs are also unlawful and in violation of § 101.9(c)(7)(i)-(iii).

### e.    The Omission of the %DV Was Misleading Under Traditional State Law Prohibitions Against Fraudulent and Deceptive Advertising.

69.    In addition to violating the aforementioned statutes, Defendant has violated the traditional common law duty not to commit fraud and mislead consumers about the characteristics and qualities of its Products, as well as traditional state law prohibitions on false and misleading advertising that long predate the FDCA or Sherman Law.

70.    Defendant's use of  protein claims throughout the Products' packaging, while failing to include the required statement of the corrected amount of protein per serving in the Nutrition Facts Panel calculated using the PDCAAS method and expressed as a %DV, is misleading. Reasonable consumers are unaware of the nutritional value of various protein sources and upon seeing front-label and back-label protein claim reasonably believe that all of the protein will be nutritionally available—i.e., that the product contains high quality proteins. Had Defendant complied with the law, the statement of the corrected amount of protein expressed as

GOOD GUSTAFSON AUMAIS LLP

a %DV would have revealed that the Products provide significantly less of the daily value of protein than high quality protein products with comparable protein quantities. Had reasonable consumers been informed of the %DV for protein, as required by FDA regulations, they would not have purchased or would have paid less for the Products.

71.     Consumers lack the meaningful ability to test or independently ascertain the truthfulness of Defendant's food labeling claims, especially at the point of sale. They would not know the quality of protein in the Products or how much of the daily recommended value of protein they provide merely by looking elsewhere on the product package given Defendant's omissions. Its discovery requires investigation well beyond the grocery store aisle and knowledge of food chemistry beyond that of the average consumer. An average consumer does not have the specialized knowledge necessary to ascertain the nutritional value of the protein in the Products. The average reasonable consumer had no reason to suspect that Defendant's representations and omissions on the packages were misleading.

72.     Defendant intends and knows that consumers will and do rely upon food labeling statements in making their purchasing decisions. Label claims and other forms of advertising and marketing drive product sales, particularly if placed prominently on the front or back of product packaging, as Defendant has done with its protein claims.

73.     Defendant's duty not to mislead consumers about the quality or nutritional value of the protein in its Products does not stem from either the FDCA or California's Sherman Law. Instead, that duty stems from traditional California prohibitions on misleading and deceptive advertising (including prohibitions on fraudulent omissions) that long predate the FDCA or Sherman Law, including the UCL's fraud prong, the CLRA, the FAL, and the common law tort of fraud.

**C. Plaintiff and Consumers Purchased the Products to Their Detriment**

74.    Plaintiff and the Class Members reasonably relied to their detriment on Defendant's misleading representations and omissions.

75.    Defendant's false, misleading, and deceptive misrepresentations and omissions are likely to continue to deceive and mislead reasonable consumers and the general public, as they have already deceived and misled the Plaintiff and the Class Members.

76.    In making the false, misleading, and deceptive representations and omissions described herein, Defendant knew and intended that consumers would pay a premium for Products represented as containing high amounts of quality protein over comparable products not so represented.

77.    In making unlawful, false, misleading, and deceptive representations, Defendant distinguishes the Products from its competitors' products. Defendant knew and intended that consumers would purchase, and pay a premium for, products labeled with protein claims and that failed to reveal they provide less of the daily value of protein than comparable products with high quality proteins. By using this branding and marketing strategy, Defendant is stating that the Products are superior to, better than, and more nutritious and healthful than other products that do not make protein claims, or that properly provide the required statement of the corrected amount of protein in the product as determined by the PDCAAS method and express as a %DV and otherwise do not mislead consumers about the quality or nutritional value of the protein in their products.

78.    For example, this competing product from Whole Foods makes protein representations throughout its product, is composed of plant-based proteins that are incomplete. In contrast with Defendant's Products, Whole Foods presents an accurate DRV for protein.

GOOD GUSTAFSON AUMAIS LLP

GOOD GUSTAFSON AUMAIS LLP




79.     Because consumers pay a price premium for products that make protein claims, and also pay a premium for products that provide more protein, by labeling its Products with protein claims and omitting the required statement of the corrected amount of protein per serving, Defendant is able to both increase its sales and retain more profits.

80.     Defendant engaged in the practices complained of herein to further its private interests of: (i) increasing sales of the Products while decreasing the sales of competitors that do not misrepresent the amount of quality protein contained in its products, and/or (ii) commanding a higher price for its Products because consumers will pay more for the Products due to consumers' demand for products with protein claims.

81.     The market for protein products is continuing to grow and expand, and because Defendant knows consumers rely on representations about the amount of quality protein in food products, Defendant has an incentive to continue to make such

unlawful and misleading representations. In addition, other trends suggest that Defendant has no incentive to change its labeling practices.

82.    For example, one market analysis revealed that between 2013-2017, product launches with a protein claim grew 31%.

83.    To capitalize on the growing market, Defendant continues to launch new product lines and flavors to diversify its portfolio to maintain its competitive edge. Moreover, Defendant has continued to replicate its misrepresentations on new products. It is therefore likely that Defendant will continue to unlawfully and/or misleadingly advertise the Products and perpetuate the misrepresentations regarding the protein in the Products.

84.    As an immediate, direct, and proximate result of Defendant's false, misleading, and deceptive representations and omissions, Defendant injured the Plaintiff and the Class Members in that they:

   a.   Paid a sum of money for Products that were not what Defendant represented;

   b.   Paid a premium price for Products that were not what Defendant represented;

   c.   Were deprived of the benefit of the bargain because the Products they purchased were different from what Defendant warranted; and

   d.   Were deprived of the benefit of the bargain because the Products they purchased had less value than what Defendant represented.

85.    Had Defendant not made the false, misleading, and deceptive representations and omissions, Plaintiff and the Class Members would not have been willing to pay the same amount for the Products they purchased, and, consequently, Plaintiff and the Class Members would not have been willing to purchase the Products.

86.    Plaintiff and the Class Members paid for Products that were high in protein but received Products that were not high in protein. The products Plaintiff

GOOD GUSTAFSON AUMAIS LLP

and the Class Members received were worth less than the Products for which they paid.

87.     Based on Defendant's misleading and deceptive representations, Defendant was able to, and did, charge a premium price for the Products over the cost of competitive products that are not represented as high in protein.

88.     Plaintiff and the Class Members all paid money for the Products. However, Plaintiff and the Class Members did not obtain the full value of the advertised Products due to Defendant's misrepresentations and omissions. Plaintiff and the Class Members purchased, purchased more of, and/or paid more for, the Products than they would have had they known the truth about the Products. Consequently, Plaintiff and the Class Members have suffered injury in fact and lost money as a result of Defendant's wrongful conduct.

## FACTS COMMON TO ALL CAUSES OF ACTION

89.     Consumers are focused on increasing the amount of protein in their diets. This increased demand indicates that consumers are willing to pay a premium for products labeled and marketed as high protein.[5]

90.     Defendant's Products are manufactured, distributed, and marketed by Defendant and sold in drug, grocery, and other online and brick-and-mortar retail stores nationwide.

91.     Based on the language that appears on each product, Plaintiff reasonably believed that Products were high in protein.

92.     The phrase "PROTEIN PACKED" is a representation to a reasonable consumer that Defendant's Products are high in protein. The phrase is misleading to a reasonable consumer because Defendant's Products are not high in protein.

[5] *See* Brooks, Robert & Simpson, S.J. & Raubenheimer, David. (2010*). The price of protein: Combining evolutionary and economic analysis to understand excessive energy consumption.* Obesity Reviews : an official journal of the International Association for the Study of Obesity. 11. 887-94. 10.1111/j.1467-789X.2010.00733.x.

GOOD GUSTAFSON AUMAIS LLP

93.    Defendant knows (and knew) that consumers will pay more for a product marketed as high protein, and intended to deceive Plaintiff and putative Class Members by labeling and marketing its Products as purportedly high-protein products.

## CLASS DEFINITIONS AND ALLEGATIONS

94.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of himself, on behalf of all others similarly situated, and as a member of the classes defined as follows (the "Class"):

>    1.    California Class: All citizens of California who, within the relevant statute of limitation periods, purchased Defendant's Products.

95.    Excluded from the Class are Defendant, its parents, subsidiaries, affiliates, officers, and directors, those who purchased the Products for resale, all persons who make a timely election to be excluded from the Class, the judge to whom the case is assigned and any immediate family members thereof, and those who assert claims for personal injury.

96.    The members of the Class are so numerous that joinder of all Class Members is impracticable. Defendant has sold, at a minimum, tens of thousands of units of the Products to Class Members.

97.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the putative Class that predominate over questions that may affect individual Class Members include, but are not limited to the following:

>    a.    whether Defendant misrepresented material facts concerning the Products on the label of every product;
>
>    b.    whether Defendant's conduct was unfair, misleading, and/or deceptive;
>
>    c.    whether Defendant has been unjustly enriched as a result of the unlawful, fraudulent, and unfair conduct alleged in this Complaint such

GOOD GUSTAFSON AUMAIS LLP

that it would be inequitable for Defendant to retain the benefits conferred upon them by Plaintiff and the Class;

    d.   whether Plaintiff and the Class are entitled to equitable and/or injunctive relief; and

    e.   whether Plaintiff and the Class have sustained damages with respect to the common-law claims asserted, and if so, the proper measure of their damages.

98.    Plaintiff's claims are typical of those of other Class Members because Plaintiff, like all members of the Class, purchased Defendant's Products bearing the high protein representations and Plaintiff sustained damages from Defendant's wrongful conduct.

99.    Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel that is experienced in litigating complex class actions. Plaintiff has no interests which conflict with those of the Class.

100.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, making it impracticable for Class Members to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

101.    The prerequisites to maintaining a class action for equitable relief are met as Defendant has acted or refused to act on grounds generally applicable to the

GOOD GUSTAFSON AUMAIS LLP

1  Class, thereby making appropriate equitable relief with respect to the Class as a

2  whole.

3      102.   The prosecution of separate actions by members of the Class would

4  create a risk of establishing inconsistent rulings and/or incompatible standards of

5  conduct for Defendant. For example, one court might enjoin Defendant from

6  performing the challenged acts, whereas another might not. Additionally, individual

7  actions could be dispositive of the interests of the Class even where certain Class

8  Members are not parties to such actions.

9                    **FIRST CLAIM FOR RELIEF**

10          **Violations of the Unfair Competition Law ("UCL"),**

11             **Cal. Bus. & Prof. Code §§ 17200 *et seq.***

12      103.   Plaintiff repeats and realleges each and every factual allegation

13  contained in the foregoing paragraphs as if fully set forth herein.

14      104.   Plaintiff brings this claim individually and on behalf of the members of

15  the proposed California Class against the Defendant.

16      105.   Defendant's conduct constitutes an unfair business act and practice

17  pursuant to California Business & Professions Code §§ 17200, *et seq.* (the "UCL"). The

18  UCL provides, in pertinent part: "Unfair competition shall mean and include

19  unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or

20  misleading advertising . . . ."

21      106.   Defendant's knowing conduct, as alleged herein, constitutes a

22  "fraudulent" business practice, as set forth in California Business & Professions Code

23  §§ 17200-17208.

24      107.   Defendant's conduct was and continues to be fraudulent because,

25  directly or through its agents and employees, Defendant made materially false

26  representations and omissions.

27      108.   As described herein, Defendant made representations that the Products

28  are high in protein when the Products are not high in protein.

GOOD GUSTAFSON AUMAIS LLP

109.    Additionally, Defendant perpetuates its misrepresentation by failing to include the DRV for protein.

110.    Defendant is aware that the representations and omissions they have made about the Products were and continue to be false and misleading.

111.    Defendant had an improper motive—to derive financial gain at the expense of accuracy or truthfulness—in its practices related to the labeling and advertising of the Products.

112.    There were reasonable alternatives available to Defendant to further its legitimate business interests, other than the conduct described herein.

113.    Defendant's conduct in making the representations and omissions described herein constitutes a knowing failure to adopt policies in accordance with and adherence to applicable laws, as set forth herein, all of which are binding upon and burdensome to their competitors. This conduct creates an unfair competitive advantage for Defendant, thereby constituting an unfair business practice under California Business & Professions Code §§ 17200-17208.

114.    In addition, Defendant's conduct was, and continues to be, unfair in that its injury to countless purchasers of the Products is substantial, and is not outweighed by any countervailing benefits to consumers or to competitors.

115.    Moreover, Plaintiff and members of the California Class could not have reasonably avoided such injury. Defendant's material misrepresentations and omissions regarding the Products were likely to deceive, and Defendant knew or should have known that its misrepresentations and omissions were untrue and misleading. Plaintiff purchased the Products in reliance on the representations made by Defendant, including that the Products' labeling was accurate as alleged herein, and without knowledge of Defendant's misrepresentations and omissions.

116.    Plaintiff and members of the California Class have been directly and proximately injured by Defendant's conduct in ways including, but not limited to, the monies paid to Defendant for the Products, interest lost on those monies, and

GOOD GUSTAFSON AUMAIS LLP

consumers' unwitting support of a business enterprise that promotes deception and undue greed to the detriment of consumers, such as Plaintiff and members of the California Class.

117.   As a result of the business acts and practices described above, Plaintiff and members of the California Class, pursuant to § 17203, are entitled to an Order enjoining such future wrongful conduct on the part of Defendant and such other Orders and judgments that may be necessary to disgorge Defendant's ill-gotten gains and to restore to any person in interest any money paid for the Products as a result of the wrongful conduct of Defendant.

118.   Pursuant to Civil Code § 3287(a), Plaintiff and the members of the California Class are further entitled to pre-judgment interest as a direct and proximate result of Defendant's fraudulent business conduct. The amount on which interest is to be calculated is a sum certain and capable of calculation, and Plaintiff and the class members are entitled to interest in an amount according to proof.

119.   Plaintiff also seeks equitable relief, including restitution, with respect to his UCL "fraudulent" prong claims. Pursuant to Federal Rule of Civil Procedure 8(e)(2), Plaintiff makes the following allegations in this paragraph only hypothetically and as an alternative to any contrary allegations in their other causes of action, in the event that such causes of action do not succeed. Plaintiff and the California Class may be unable to obtain monetary, declaratory and/or injunctive relief directly under other causes of action and will lack an adequate remedy of law, if the Court requires them to show classwide reliance and materiality beyond the objective reasonable consumer standard applied under the UCL, because Plaintiff may not be able to establish each Class member's individualized understanding of Defendant's misleading representations as described in this Complaint, but the UCL does not require individualized proof of deception or injury by absent class members. *See, e.g., Stearns v Ticketmaster*, 655 F.3d 1013, 1020, 1023-25 (distinguishing, for purposes of CLRA claim, among class members for whom website representations may have been

materially deficient, but requiring certification of UCL claim for entire class). In addition, Plaintiff and the California Class may be unable to obtain such relief under other causes of action and will lack an adequate remedy at law, if Plaintiff is unable to demonstrate the requisite *mens rea* (intent, reckless, and/or negligence), because the UCL imposes no such *mens rea* requirement and liability exists even if Defendant acted in good faith.

### SECOND CLAIM FOR RELIEF

**Violations of the False Advertising Law ("FAL"),**

**Cal. Bus. & Prof. Code §§ 17500 *et seq*.**

120.    Plaintiff repeats and realleges each and every factual allegation contained in the foregoing paragraphs as if fully set forth herein.

121.    Plaintiff brings this claim individually and on behalf of the members of the proposed California Class against the Defendant.

122.    California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq*., makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, ... in any advertising device ... or in any other manner or means whatever, including over the Internet, any statement, concerning ... personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

123.    Defendant committed acts of false advertising, as defined by §§ 17500, *et seq*., by misrepresenting that the Products were high in protein and omitting the DRV for protein.

124.    Defendant knew or should have known through the exercise of reasonable care that its "PROTEIN PACKED" representation and other misrepresentations for the Products were false, misleading and/or deceptive.

125.    Defendant's actions in violation of § 17500 were false and misleading such that the general public is and was likely to be deceived. Consumers, including

Plaintiff and members of the California Class, necessarily and reasonably relied on Defendant's statements regarding the contents of its products. Consumers, including Plaintiff and members of the California Class, were among the intended targets of such representations.

126. As a result of Defendant's conduct, Plaintiff and members of the California Class were harmed and suffered actual damages as a result of Defendant's FAL violations because: (a) they would not have purchased the Products on the same terms if they knew that the Products were not high in protein; (b) they paid a price premium for the Products based on Defendant's misrepresentations and omissions; and (c) the Products do not have the characteristics, ingredients, uses, benefits, or quantities as promised, namely the represented protein content. Additionally, misbranded food products cannot legally be manufactured, held, advertised, distributed or sold. Thus, misbranded food has no economic value and is worthless as a matter of law, and purchasers of misbranded food are entitled to a refund of the purchase price of the misbranded food. Plaintiff and members of the California Class have thus been damaged either in the full amount of the purchase price of the Products or in the difference in value between the Products as warranted and the Products as actually sold. Defendant has further been unjustly enriched at the expense of Plaintiff and the members of the California Class.

127. Because the Court has broad discretion to award restitution under the FAL and could, when assessing restitution under the FAL, apply a standard different than that applied to assessing damages under the CLRA, and restitution is not limited to returning to Plaintiff and California Class Members monies in which they have an interest, but more broadly serves to deter the offender and others from future violations, the legal remedies available under the CLRA are more limited than the equitable remedies available under the FAL, and are therefore inadequate.

### THIRD CLAIM FOR RELIEF

### Violations of the Consumer Legal Remedies Act ("CLRA"),

### Cal. Civ. Code §§ 1750 *et seq.*

128.    Plaintiff repeats and realleges each and every factual allegation contained in the foregoing paragraphs as if fully set forth herein.

129.    Plaintiff brings this claim individually and on behalf of the members of the proposed California Class against the Defendant.

130.    At all times relevant hereto, Plaintiff and members of the California Class were "consumer[s]," as defined in Civil Code section 1761(d).

131.    At all times relevant hereto, Defendant constituted a "person," as defined in Civil Code section 1761(c).

132.    At all times relevant hereto, the Products manufactured, marketed, advertised, and sold by Defendant constituted "goods," as defined in Civil Code section 1761(a).

133.    The purchases of the Products by Plaintiff and members of the California Class are "transactions" within the meaning of Civil Code section 1761(e).

134.    Defendant disseminated, or caused to be disseminated, through its packaging, labeling, marketing and advertising misrepresentations that the Products were and are high in protein.

135.    Defendant's representations violate the CLRA in at least the following respects:

a.    In violation of Civil Code § 1770(a)(5), Defendant represented that the Products have characteristics, ingredients, uses, benefits, and quantities which they do not have;

b.    In violation of Civil Code § 1770(a)(7), Defendant represented that the Products are of a particular standard, quality, or grade, which they are not; and

c.   In violation of Civil Code § 1770(a)(9), Defendant advertised the Products with an intent not to sell the products as advertised.

136.   Pursuant to the provisions of Cal. Civ. Code § 1782(a), Plaintiff provided notice to Defendant of its alleged violations of the CLRA, demanding that Defendant correct such violations, and providing it with the opportunity to correct its business practices. Notice was sent via certified mail, return receipt requested on March 22, 2022. As of the date of filing this complaint, Defendant has not responded. Accordingly, if after 30 days no satisfactory response to resolve this litigation on a class-wide basis has been received, Plaintiff will seek leave to amend this request to seek restitution and actual damages as provided by the CLRA.

137.   Pursuant to California Civil Code § 1780, Plaintiff seeks injunctive relief, reasonable attorneys' fees and costs, and any other relief that the Court deems proper.

138.   Defendant knew or should have known that its Products did not contain the claimed characteristics because Defendant manufactured, marketed and sold its Products without those characteristics that it claimed. Defendant knew or should have known that its representations about its products as described herein violated consumer protection laws, and that these statements would be relied upon by Plaintiff and members of the California Class.

139.   Defendant's actions as described herein were done with conscious disregard of Plaintiff's and California Class Members' rights and was wanton and malicious.

140.   Defendant's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA since Defendant is still representing that its Products have characteristics which they do not have.

GOOD GUSTAFSON AUMAIS LLP

## FOURTH CLAIM FOR RELIEF

### Unjust Enrichment

141.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

142.    Plaintiff brings this claim individually and on behalf of the members of the proposed California Class against the Defendant.

143.    At all times relevant hereto, Defendant deceptively marketed, advertised, and sold merchandise to Plaintiff and the California Class.

144.    Plaintiff and members of the California Class conferred upon Defendant nongratuitous payments for the Products that they would not have if not for Defendant's deceptive advertising and marketing. Defendant accepted or retained the nongratuitous benefits conferred by Plaintiff and members of the California Class, with full knowledge and awareness that, as a result of Defendant's deception, Plaintiff and members of the California Class were not receiving a product of the quality, nature, fitness, or value that had been represented by Defendant and reasonable consumers would have expected.

145.    Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff's and California Class Members' purchases of the Products. Retention of those monies under these circumstances is unjust and inequitable because of Defendant's misrepresentations about the Products, which caused injuries to Plaintiff and California Class Members because they would not have purchased the Products if the true facts had been known.

146.    Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiff and members of the California Class is unjust and inequitable, Defendant must pay restitution to Plaintiff and members of the California Class for its unjust enrichment, as ordered by the Court. Plaintiff and those similarly situated have no adequate remedy at law to obtain this restitution.

## RELIEF DEMANDED

147.    WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the members of the Class;

b. For an order declaring the Defendant's conduct violates the statutes and laws referenced herein;

c. For an order awarding, as appropriate, compensatory and monetary damages, restitution or disgorgement to Plaintiff and the Class for all causes of action;

d. For an order requiring Defendant to immediately cease and desist from selling their misbranded Products in violation of law; enjoining Defendant from continuing to label, market, advertise, distribute, and sell the Products in the unlawful manner described herein; and ordering Defendant to engage in corrective action;

e. For prejudgment and post judgment interest on all amounts awarded;

f. For an order awarding punitive damages; and

g. For an order awarding attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Plaintiff demands a trial by jury on all causes of action and issues so triable.

GOOD GUSTAFSON AUMAIS LLP

Dated: November 10, 2022

Respectfully submitted,

By: /s/ Christopher T. Aumais
Christopher T. Aumais  (SBN 249901)
**Good Gustafson Aumais LLP**
2330  Westwood Blvd., No. 103
Los Angeles, California 90064
Telephone: (310) 274-4663
cta@ggallp.com

By: /s/ Steffan T. Keeton
Steffan T. Keeton*
**THE KEETON FIRM LLC**
100 S Commons, Suite 102
Pittsburgh, PA 15212
Telephone: (888) 412-5291
stkeeton@keetonfirm.com
*pro hac vice* to be sought

*Counsel for Plaintiff and the Class*

GOOD GUSTAFSON AUMAIS LLP

CLASS ACTION COMPLAINT